UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| **SHIRLEY A. LOVETT,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.: 3:21-cv-01676-RDP |
| } | |
| **KILOLO KIJAKAZI, COMMISSIONER** } | |
| **OF SOCIAL SECURITY,** } | |
| } | |
| **Defendant.** } | |

**MEMORANDUM OF DECISION**

Plaintiff Shirley A. Lovett brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability and disability insurance benefits ("DIB"). *See also* 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**I.      Proceedings Below**

This action arises from Plaintiff's application for disability and DIB dated January 6, 2020, alleging disability that began on October 4, 2019. (Tr. 87, 104, 231). Plaintiff's application was denied initially by the Social Security Administration on September 25, 2020, and upon review on December 2, 2020. (Tr. 134, 141-42). On December 21, 2020, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 146-47). Plaintiff's request was granted, and a hearing was held via teleconference on April 29, 2021 before ALJ Cynthia G. Weaver. (Tr. 66). In attendance were Plaintiff, Plaintiff's counsel, and a Vocational Expert ("VE"). (*Id.*).

On May 26, 2021, the ALJ issued an unfavorable decision finding Plaintiff has not been under a disability, as defined in the Act from October 4, 2019 through the date of the decision. (Tr. 26). Plaintiff filed a request for review of the ALJ's decision on July 9, 2021. (Tr. 50-51). The Appeals Council denied Plaintiff's request (Tr. 1-6), rendering the ALJ's decision the final decision and therefore a proper subject of this court's appellate review. 42 U.S.C. § 405(g).

At the time of the ALJ's decision, Plaintiff was 51 years old, a high school graduate, and had received a Certified Nursing Assistant ("CNA") certificate. Plaintiff's past work experience is that of a CNA. (Tr. 24-25, 321). Plaintiff alleges disability due in part to multiple sclerosis ("MS"), obesity, degenerative disc disease, obstructive sleep apnea, depression, and anxiety. (Tr. 17, 333). Plaintiff testified that she lives with her husband and two adult children.[1] (Tr. 17, 348). Plaintiff further testified that she is the representative payee for her daughter's disability benefits. (Tr. 70). Plaintiff reports she is unable to cook, do housework, manage finances, and go grocery shopping, but that she is able to drive, bathe, and feed herself. (Tr. 22, 80, 793). Plaintiff also reports that a typical day involves "laying around, playing games on her phone, and watching television." (Tr. 22, 793).

Plaintiff further testified that she stopped working on October 4, 2019 due to a workplace back injury that required her to visit the emergency room shortly thereafter. (Tr. 19, 665-66). The October 4, 2019 emergency room report indicated that Plaintiff had "multilevel small degenerative osteophytes, but no acute osseous abnormality." (Tr. 19, 664). The report also noted a "normal back inspection, but with muscle spasms." (*Id.*). Plaintiff's range of motion and sensation were normal. (Tr. 19, 666). Plaintiff was given a Toradol injection, diagnosed with a lumbar muscle strain, and discharged with Flexeril as needed for pain. (Tr. 17, 833).

---

[1] Plaintiff testified that her adult daughter has special needs, and her adult son is "moving out." (Tr. 70).

Plaintiff alleges back pain that emerged before her alleged onset date of October 4, 2019, and has cited records from Russellville Hospital, family medicine practitioner Dr. Keith Morrow, and neurologists Dr. Benjamin Fulmer and Dr. Christopher Leganke. (Tr. 19, 578, 585-86, 835, 842). On September 22, 2016, Plaintiff underwent a lumbar spine MRI at Russellville Hospital that showed a "[s]mall posterior protrusion [of] disc material with minimal compromise of the left of midline thecal sac," "[b]road-based posterior protrusion of disc material with compromise of left paramidline thecal sac," suggesting "impingement of the left-sided exiting L4 nerve root," and "[m]ultilevel lumbar degenerative disc disease" along with "[m]ultilevel bilateral facet arthropathy." (Tr. 578). Plaintiff received another lumbar spine MRI at Russellville Hospital on August 20, 2019 that showed a "broad-based protrusion of the L4-L5 disc," "central protrusion of the L5-S1 disc," and "[m]ultilevel hypertrophy facets." (Tr. 579).

Dr. Fulmer's treatment notes from Plaintiff's MRI findings from July and August 2019 indicate "mild C5-C6 stenosis and a normal lumbar and cervical MRI with a slight bulge at L5-S1" as well as "a broad-based protrusion of the L4-L5 disc," which was an improvement from Plaintiff's previous MRI in 2016. (Tr. 19, 585-86, 578-79). Dr. Fulmer noted in August 2019 that Plaintiff had no spinal deformity, normal posture and gait, a full range of motion with all joints, and normal neurological findings. (Tr. 19, 586-87). Dr. Fulmer sent orders to Encore Rehabilitation for Plaintiff to begin physical therapy. (Tr. 19, 678).

Plaintiff underwent physical therapy at Encore Rehabilitation from September 18, 2019 until discharge on November 28, 2019 due to completion of therapy and plateau of progress. (Tr. 19, 753, 762). Encore Rehabilitation's initial evaluation in September 2019 found that Plaintiff presented with moderate upper trapezius and hamstring restrictions, "[h]ypomobile/[p]ainful" thoracic joint integrity, spine tenderness, and decreased cervical range of motion. (Tr. 684-85). In

3

October 2019, while undergoing physical therapy, Plaintiff reported feeling "a little bit better since not having to tug, lift and pull at work now, as long as she doesn't over do things and takes her time with her normal ADLs." (Tr. 19, 718). The record indicates Plaintiff visited Encore Rehabilitation on seventeen separate occasions – between September 2019 and November 2019. (Tr. 688, 692, 698, 702, 706, 710, 714, 718, 724, 727, 732, 737, 742, 746, 750, 754, 758). Throughout this time period, Plaintiff's condition "slowly improv[ed]" by increasing strength and range of motion. (Tr. 720, 757-62)

Following her discharge from physical therapy, Plaintiff returned to Dr. Morrow in April 2020 and her "neuro/musculoskeletal examination findings were normal." (Tr. 20, 825). Plaintiff again returned to Dr. Morrow in February 2021 complaining of lumbar spine pain. (Tr. 20, 822). Dr. Morrow's examination indicated "palpable spasms in the lumbar spine" as well as "severe spurring at T12-L1, spurring at T10-L2, and narrowing at L4-L5 and L5-S1." (Tr. 20, 824). Dr. Morrow prescribed Plaintiff with Robaxin and Ultram. (Tr. 20, 822). Plaintiff's August 2020 medical consultive examination ("CE") performed by Dr. Laura Lindsey found Plaintiff's spine had (1) no pain of the cervical, thoracic, or lumbosacral spine or the surrounding muscles; (2) full range of motion in all extremities without difficulty; (3) normal motor strength; (4) grossly intact II-XII cranial nerves; (5) no visible tremors; (6) normal reflexes and sensation; and (7) normal, coordinated gait. (Tr. 21, 786-87).

Plaintiff has a documented history of MS. Plaintiff reports that she was initially diagnosed with MS in 2014. (Tr. 784). Plaintiff visited neurologist Dr. Christopher Leganke in July 2019 for a brain MRI which showed no active lesions and stable condition since March 2018. (Tr. 18, 681). Plaintiff returned to Dr. Leganke in October 2019 for an examination, complaining of pain and fatigue. (Tr. 835). Dr. Leganke's examination showed Plaintiff was mentally alert, coordinated,

attentive, and that her speech was normal. (Tr. 18, 835). In February 2020, Plaintiff visited Dr. Leganke again.  She presented with fatigue, slower gait, mildly decreased muscle strength, and "moderately decreased vibration at the bilateral knees" compared to her October 2019 visit. (Tr. 18, 842).  Otherwise, Plaintiff's status remained stable from October 2019 to February 2020. (*Id.*). Plaintiff returned to Dr. Leganke in June 2020 for another brain MRI that showed Plaintiff's condition as stable since July 2019. (Tr. 18, 850). Dr. Leganke prescribed Plaintiff with Aubagio until February 24, 2020. (Tr. 842). Plaintiff reported in January 2021 that her insurance had approved the Aubagio prescription, but that she had not filled the prescription "in several months." (Tr. 18, 864).

Plaintiff submitted headache questionnaires alleging daily headaches -- two to three migraines per week. (Tr. 13, 358, 383). On February 13, 2019, Plaintiff reported headaches while at Encore Rehabilitation. (Tr. 589). Plaintiff also complained of headaches to Dr. Fulmer on July 22, 2019. (Tr. 672). Plaintiff reported migraines to Dr. Morrow on August 13, 2019 and again while at Encore Rehabilitation on September 18, 2019. (Tr. 585, 684). Plaintiff reported "headaches on a regular basis" at Helen Keller Hospital on July 1, 2020 and to Dr. Laura Lindsey on August 31, 2020. (Tr. 784). Dr. Leganke administered Botox injections beginning in October 2019 which successfully reduced the frequency of Plaintiff's migraine headaches. (Tr. 13, 838, 840, 847, 855, 861, 869). Additionally, Dr. Leganke prescribed Butorphanol Tartrate nasal spray and Fioricet for migraines, but Dr. Leganke's notes from January 2021 show that Plaintiff had not filled her Fioricet since 2019. (Tr. 13, 865).

Regarding mental impairments, according to psychologist Dr. James Lindsey, Plaintiff's anxiety and depression "appear to stem from situational stressors with her son, her mother's health, and worrying about paying bills." (Tr. 20, *see* Tr. 791-94). Plaintiff's psychological CE was

conducted by Dr. Lindsey on September 23, 2020; Plaintiff reported feelings of sadness, helplessness, and worthlessness that began when she "had to go from full-time to part-time at her job due to her medical problems." (Tr. 21, 791). The only mental health medication prescribed to Plaintiff was Wellbutrin, and she complied with her medication. (*Id.*). Plaintiff's concentration and attention "appeared to be average to below average" while her "memory was intact with the exception of short-term memory, which appeared to be below average." (Tr. 22, 791). Dr. Lindsey found that Plaintiff's fund of information was average but "thought content was notable for depression." (Tr. 22, 793). Thus, Dr. Lindsey diagnosed Plaintiff with "major depressive disorder, recurrent, episode, mild; and generalized anxiety disorder." (*Id.*).

In terms of Plaintiff's activities of daily living ("ADLs"), Dr. Lindsey noted that Plaintiff appeared capable of independent living with financial support. (Tr. 22, 794). Plaintiff reported that a typical day involved "laying around, playing games on her phone, and watching television." (Tr. 22, 793). Plaintiff further reported that she was able to drive, bathe and feed herself, but did not do housework or shop for groceries because of pain. (*Id.*). Dr. Lindsey therefore noted that Plaintiff "appears capable of independent living with some support with finances." (Tr. 794).

Plaintiff participated in a medical CE conducted by Dr. Laura Lindsey on August 31, 2020. (Tr. 20, 784). Dr. Lindsey's examination indicated that Plaintiff was cooperative, pleasant, had a body mass index ("BMI") of 40.56, and was in no acute distress. (Tr. 20, 785). A spinal examination indicated, consistent with earlier findings, that Plaintiff had "no pain of the cervical, thoracic, or lumbosacral spine" nor the surrounding muscles. (Tr. 20, 786). Plaintiff had a full range of motion of the spine, was alert, and her cranial nerves were "grossly intact." (Tr. 21, 786). Plaintiff's sensation, reflexes, strength, and gait were all normal. (Tr. 21, 787). Based on these

findings, Dr. Lindsey diagnosed "MS, dysautonomia, chronic back pain, hypertension, hyperlipidemia, hypothyroidism, depression, and IgM deficiency." (Tr. 21, 787).

## II. ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572. "Substantial" work activity is work that involves doing significant physical or mental activities. *Id.* § 404.1572(a). "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b). If the ALJ finds that the claimant engages in activity that meets both of these criteria, then the claimant cannot claim disability. *Id.* § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. *Id.* § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See Id.* §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's RFC, which refers to the claimant's ability to work despite her impairments. *Id.* § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the

ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. *Id.* § 404.1520(a)(4)(v). Finally, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. *Id.* § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

Here, the ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2024, and that she had not engaged in substantial gainful activity since her onset of the alleged disability. (Tr. 13). Additionally, the ALJ determined Plaintiff had the severe impairments of obesity, MS, degenerative disc disease, obstructive sleep apnea, anxiety, and depression, but does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 13-14).

Plaintiff was 51 years old on the alleged disability onset date, which the ALJ "defined as . . . closely approaching advanced age." (Tr. 24). The ALJ determined that Plaintiff's medical records indicated "no intellectual impairment relative to her work history." (Tr. 22, 793). Based on the testimony of the VE, the ALJ determined that Plaintiff was not capable of performing past relevant work as a Nursing Assistant, but retained "the RFC to perform a reduced range of light work as defined in 20 C.F.R. § 404.1567(b)." (Tr. 16, 24). The ALJ further determined that transferability of job skills was irrelevant to the determination of disability because the Medical-Vocational Rules supported a determination that Plaintiff was "not disabled" regardless of transferability of job skills. (Tr. 25). Considering Plaintiff's RFC and the VE's testimony, the ALJ determined that jobs exist in significant numbers in the national economy that Plaintiff can perform

and therefore, had not been under a disability as defined by the Act from October 4, 2019, through the date of the ALJ's decision. (Tr. 22, 26, 83-84, 793). (*Id.*).

The ALJ did not defer to or grant specific evidentiary weight to any previous administrative medical findings or medical opinions. (Tr. 22). Dr. Laura Lindsey opined that Plaintiff did "not appear limited by her medical conditions." (Tr. 22, 787). While the ALJ found Dr. Lindsey's opinion supports a reduction in Plaintiff's RFC to "Light Work" due to her weight and age, the ALJ was "not fully persuaded by Dr. Lindsey's opinion" that Plaintiff's impairments did not cause any limitations. (Tr. 22, 787). The ALJ found Dr. James Lindsey's opinion that Plaintiff's mental health symptoms posed "mild to moderate" impairments in term of her employability to be "partially persuasive." (Tr. 22, 794). The ALJ found no support for Plaintiff's contention that she needs help with finances. (Tr. 23). The ALJ found the opinion of state agency medical consultants that Plaintiff was "limited to the medium exertional level with additional limitations" to be "somewhat persuasive." (*Id.*). Rather than a reduction to the medium exertional level, the ALJ found that a "reduction to the light exertional" level with limitations on postural activities, hazards, and extreme heat/cold was more supported by the medical evidence. (*Id.*). The ALJ found the opinions of state agency psychological consultants that Plaintiff would be able to carry out short tasks while likely to struggle with complex instructions to be "not very persuasive." (*Id.*).

The ALJ also considered a Third-Party Function Report that was completed by Plaintiff's husband in March 2020 in which he reported that Plaintiff's medical conditions affected her ability to lift, walk, stand, sit, remember, and handle stress. (Tr. 23-24, 347-53). However, Plaintiff's husband also reported that Plaintiff drove, shopped, managed finances, cared for pets, watched television, played games, and socialized when able. (Tr. 24, 347-53).

After reviewing the record, the ALJ found Plaintiff's medically determinable impairments could have produced her alleged symptoms, but that objective medical evidence did not support the degree to which Plaintiff claimed they limited her. (Tr. 24). Further, the ALJ found that Plaintiff's objective medical testing "did not support the severity" of Plaintiff's alleged symptoms for twelve consecutive months. (*Id.*).The ALJ also found that Plaintiff's "testimony was not reasonably consistent with the evidence of record." (*Id.*). Thus, the ALJ found that Plaintiff was capable of sustaining work activity within the restrictions of the aforementioned RFC assessment.

Further, the ALJ found that Plaintiff was "unable to perform any past relevant work" as a Nurse Assistant (DOT #355.674-014), which is "classified at the medium exertional level and as semiskilled" with a specific vocational preparation (SVP) rating of 4, but Plaintiff performed this work at the heavy exertional level. (*Id.*; Tr. 81-84). The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience with "limitations consistent with those contained in the RFC" would be unable to perform Plaintiff's past relevant work. (Tr. 24, 81-84).

The ALJ relied on the VE's testimony to find that Plaintiff was unable to perform any past relevant work "as actually or generally performed." (Tr. 24, 81-84). However, the ALJ concluded that jobs exist in significant numbers in the national economy that Plaintiff cand perform such as laundry classifier, garment sorter, and folder. (Tr. 25, 81-84). The VE classified these jobs "at the light exertional level and as unskilled with SVPs of two." (Tr. 26, 81-84). Based on these findings, the ALJ found that Plaintiff was "not disabled" under §§ 216(i) and 223(d) of the Act. (Tr. 26).

### III.  Plaintiff's Argument for Remand or Reversal

Plaintiff contends that "[t]he ALJ's finding that [she] can perform work was not supported by substantial evidence." (Doc. 11 at 13). To support this contention, Plaintiff presents two primary arguments. First, she contends that the ALJ mistakenly found that her migraine headaches were

10

not a severe impairment. (*Id.* at 14). Plaintiff argues that the ALJ failed to consider the treatment notes of her medical providers that "clearly demonstrate disabling migraine headaches." (*Id.* at 15). Second, Plaintiff contends that the ALJ erred in evaluating her credibility. (*Id.* at 17). According to Plaintiff, the ALJ ignored medical records that corroborate her statements regarding her memory, pain, fatigue, and ability to stand and sit. (*Id.* at 20, 22, 24, 27).

## IV. Standard of Review

The only issues before the court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates ALJ's against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the findings is

limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.     Discussion

Plaintiff offers two reasons why the ALJ erred in determining that she was ineligible for disability and DIB. The court addresses each of Plaintiff's arguments in turn, but finds that substantial evidence supports the ALJ's decision and that the ALJ applied the proper standards to reach her conclusions. (*See* Tr. 26).

### A.     The ALJ's Determination that Plaintiff's Migraine Headaches were Not a Severe Impairment was Supported by Substantial Evidence.

Plaintiff asserts that the ALJ erred in failing to find her headaches as a severe impairment. (Doc. 11 at 15). An ALJ must apply the two-step "pain standard" to subjective testimony to analyze a claimant's self-reported pain and suffering. Under this standard, a claimant must first present objective "evidence of an underlying medical condition." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). If the claimant satisfies the first element, the claimant must then either: (a) present "objective medical evidence confirming the severity of the alleged pain," or (b) show "that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *See Id.*; 20 C.F.R. § 1429. Applying the pain standard to the present case, the court concludes that the ALJ's decision not to deem Plaintiff's migraine headaches as a severe impairment was supported by substantial evidence because Plaintiff failed to confirm the severity of the migraines and that her migraine headaches prevented her from performing light work with limitations as the VE outlined in this case. (Tr. 13-14, 838-43, 847).

The ALJ referred to specific medical records indicating that (1) the severity of Plaintiff's headaches were reduced by Botox injections, and (2) Plaintiff was prescribed migraine medication but had not filled that prescription since 2019. (Tr. 13, 838-43, 847, 865). The ALJ then

"considered all of [Plaintiff]'s medically determinable impairments," including non-severe impairments, when assessing Plaintiff's RFC, indicating that the ALJ considered Plaintiff's entire medical history when making her decision. (Tr. 14). The ALJ concluded, based on the record evidence, that Plaintiff failed to show how her migraine headaches prevented her from performing a range of light work. (Tr. 13, 81-84, 838-43, 847). Thus, the court determines that the ALJ's determination that Plaintiff's migraine headaches were not a severe impairment was supported by substantial evidence. (Tr. 13, 787, 838-43, 847).

### B. The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to properly evaluate her credibility by relying on her ADLs and medical records. (Doc. 11 at 17). The court recognizes that "credibility determinations are the province of the ALJ" and that a "reviewing court may not reweigh the evidence." *Aderholt v. Astrue*, 2012 WL 2499164 at *2 (N.D. Ala. 2012) (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)). Thus, when an ALJ articulates specific reasons for rejecting a claimant's opinion and "substantial evidence supports those reasons, no reversible error exists." *Id.* Further, the ALJ may reject any medical opinion if supported by medical evidence, but the ALJ must "articulate specific reasons for rejecting" a medical opinion. *Id.* The ALJ is also not required to specifically refer to every piece of medical evidence when making her decision. *Id.* Finally, the controlling question regarding a claimant's credibility is not whether the ALJ could reasonably have credited a witness, but rather, whether the ALJ was "clearly wrong to discredit" a claimant's testimony. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011). *Id.*

Here, the ALJ did not err in evaluating Plaintiff's credibility by finding that her medically determinable impairments could reasonably have been expected to cause her alleged symptoms, while also finding that her statements regarding the intensity and consistency of her alleged

symptoms were not consistent with the medical evidence. (Tr. 18). In making this finding, the ALJ reviewed the entire record and noted inconsistencies between Plaintiff's statements and the medical evidence, such as the specific ADLs that Plaintiff was able to perform and how responsible she was for caring for family members. (Tr. 17, 22).

This court sitting in review of the ALJ's findings does not reweigh evidence. The ALJ's determination that Plaintiff's statements were not consistent with medical evidence was supported by substantial evidence. (Tr. 16-24). Thus, the ALJ did not err by considering Plaintiff's ADLs and refusing to confer full credibility upon Plaintiff's statements that contradicted the medical evidence. (Tr. 17-24; 718). Further, the ALJ considered all available medical evidence by factoring every medical record into the decision. *See* 20 C.F.R. § 404.1529(c). The ALJ recounted and gave appropriate weight to each of Plaintiff's visits with Dr. Leganke, Dr. Benjamin Fulmer, Dr. Keith Morrow, physical therapy, and the emergency room. (Tr. 18-20, 584-90, 666-686, 675-78, 718, 822-25, 835, 842, 845, 850-51, 864).

Regarding Plaintiff's mental impairments, the ALJ concluded that Plaintiff's depression and anxiety stemmed from "situational stressors" regarding her family's health and finances. (Tr. 20, 842, 858, 864). However, the medical evidence indicates that Plaintiff was alert, was in no acute distress, had intact memory and attention, and that her speech, mood, and fund of knowledge were all normal. (Tr. 20, 835, 844, 854, 860, 866). Thus, substantial evidence supports the ALJ's finding that Plaintiff had "mild to moderate" mental impairments. (Tr. 14-16, 791-94; *see* 20 C.F.R. § 404.1520). Substantial evidence supports the ALJ's finding under steps two and three that Plaintiff had severe mental impairments, but did not have an impairment that met the criteria for listed impairments under the Act. (Tr. 20-24, 791-94; *see* 20 C.F.R. § 404.1520). Further, while Plaintiff asserts that she struggles with memory and concentration, the ALJ accounted for this

limitation by restricting Plaintiff to jobs that involve simple directions and well-explained workplace changes. (Tr. 16, 81-84). Thus, since the ALJ identified multiple inconsistencies between Plaintiff's statements and the medical evidence, substantial evidence suggests the ALJ's decision to discredit Plaintiff's statements was not "clearly wrong." *Werner*, 421 F. App'x at 939. Thus, the court concludes that the ALJ's findings regarding Plaintiff's credibility were supported by substantial evidence. *See Id.*

## VI.   Conclusion

The court concludes that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this July 26, 2023.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE